**In re REEF PETROLEUM CORPORATION, Debtor.**

**REEF PETROLEUM CORPORATION and The Official Unsecured Creditors' Committee, Plaintiffs,**

v.

**The UNITED STATES of America, Defendant.**

Bankruptcy No. NT 83–02437.
Adv. No. 86–0665.

United States Bankruptcy Court, W.D. Michigan.

April 24, 1989.

See also, Bkrtcy., 92 B.R. 741.

Timothy Haring, Suttons Bay, Mich., for plaintiff, Reef Petroleum Corp.

Hertzberg, Jacob & Weingarten, David Murphy, Detroit, Mich., for plaintiff, The Official Unsecured Creditors' Committee.

John A. Smietanka, U.S. Atty., Janice Kittel Mann, Asst. U.S. Atty., Grand Rapids, Mich., and Thomas R. Jones, U.S. Dept. of Justice, Tax Div., Washington, D.C., for defendant, U.S.

## OPINION

DAVID E. NIMS, Jr., Bankruptcy Judge.

On August 25, 1986, the Debtor, Reef Petroleum Corporation (Reef), and the Official Unsecured Creditors' Committee (the Committee), brought this adversary proceeding against the United States through the Internal Revenue Service (IRS) to recover a tax refund allegedly owed Reef in the amount of $112,613.57. The alleged claim arose as follows. The IRS mistakenly paid the same refund twice. The IRS discovered the error and set off the overpayment against a subsequent refund. The Debtor and the Committee brought this action to void the set off, claiming: (1) the claim the IRS set off was subordinate to the security interest granted to the Committee by the terms of the confirmed plan; and (2) the set off violated the automatic stay. The IRS counterclaimed for a further $12,743.79 allegedly due on a windfall profit tax for 1981. After oral arguments on motions for summary judgment, the matter was taken under advisement. Thereafter, the parties submitted briefs and stipulated facts upon which the court has relied.

### I. JURISDICTION

The parties stipulated that this court has jurisdiction pursuant to 28 U.S.C. § 1334. Further, the parties stipulated that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

## II. FACTS

Reef has been engaged in oil and gas exploration in the Traverse City, Michigan, area since 1972. In the late '70's and the early '80's the oil and gas industry was booming. In 1981 Reef owed taxes totalling $617,450. To obtain an extension of time for filing its tax returns, Reef made an estimated payment of $340,000. Subsequently, petroleum prices declined causing Reef to sustain huge losses.

Thereafter, Reef filed amended tax returns for 1981. The amended returns allowed Reef tax credits for tax loss carry backs, abated interest and abated penalties. On September 12, 1983, the IRS credited Reef's account in the sum of $112,613.57.[1] This is the first refund. This credit brought Reef's account to a zero balance.

On September 23, 1983, Reef filed a petition under Chapter 11 of the Bankruptcy Code. See 11 U.S.C. §§ 1101–1146. At the time of filing, the IRS was not a creditor of Reef.

The problems facing the oil business continued and Reef filed additional amended returns claiming tax loss carry backs. The transactions concerning Reef's account were so numerous and complex, the IRS brought in an expert, David R. Cook, to handle the Reef account.[2] The IRS assigned Mr. Cook to the Reef account because of his proficiency in excess profit taxes. Mr. Cook worked with Reef's accountants trying to determine the amount of refunds to which Reef was entitled.

On October 20, 1983, the IRS repeated the refund of September 12, 1983, crediting Reef's account in the sum of $112,613.57. This credit was in error. The amount, $112,613.57, was an exact duplicate of the amount credited to Reef's account on September 12, 1983. The parties agree there was no justification for this second refund. The IRS simply credited Reef's account twice, when the account only required one credit.

The IRS compounded the mistake on October 24, 1983, when it paid Reef $148,001.82, which included the $112,613.57 erroneous credit, plus an interest abatement credit of $35,388.25. After this payment Reef's account again had a zero balance.

On May 9, 1984, the IRS discovered the erroneous credit and payment, and debited Reef's account by $112,613.57. At the time Reef's account had a standing credit of $16,561.59. Thus, after the IRS set off the $16,561.59, Reef owed the IRS $96,051.98. On May 15, 1984, the IRS filed a proof of claim for $96,051.98.

During November and December of 1986, the IRS entered additional tax credits in Reef's account. These transactions resulted in the IRS owing Reef $754,857.11. Subsequently, Reef's account was debited in the sum of $100.99, and the IRS issued Reef two refund checks which totalled $658,704.14. Total debits equaled $658,805.13. The difference between the total debits and credits is $96,051.98. This difference represents the remaining amount due to the IRS from the mistaken credit of $112,613.57 entered on May 9, 1984. After all debits and credits were entered in Reef's account, and after the IRS set off the $96,051.98 outstanding from the erroneous payment, Reef's account again had a zero balance. When the IRS set off the $96,051.98, the Committee and Reef (collectively "the plaintiffs") brought this adversary proceeding.

The provisions of the Debtor's confirmed plan are also relevant to this opinion. After notice and hearing, the Second Amended Plan of Reorganization (the Plan) was confirmed on April 25, 1985. The IRS did not object at the confirmation hearing. The effect of confirmation was set out in Article III of the Plan. Article III provided that confirmation of the Plan shall constitute complete settlement with affected creditors and interest holders as to liability

---

**1.** Previous transactions occurred, but they are unimportant for this opinion.

**2.** According to the Stipulation of Facts, there were twenty-eight separate transactions between December 6, 1982, when the original motion was filed, and December 12, 1986, when the IRS issued a refund bringing the account to zero.

of the Debtor except as to payments of amounts called for by this Plan.

The Plan designated eight separate classes of creditors. Class 2 (Taxes) consisted of "all allowed claims that are entitled to priority under Section 507(a)(6) of the Bankruptcy Code."[3] The rights of the class 2 claimants were set out in Article II, Section B of the Plan which provided:

> Class 2 claims (Taxes) shall be impaired and shall be paid in deferred cash payments over a period of six (6) years after the date of assessment of each such claim, of a value, as of the effective date of this Plan, equal to the allowed amount of each such claim as made and provided by Section 1129(a)(9)(c) of the Bankruptcy Code. Such deferred payments shall be evidenced by unsecured notes bearing interest at the rate set forth by 28 U.S.C. § 1961 computed as of the effective date of this Plan and to be issued by the Debtor upon the effective date of this Plan. These notes shall be payable in equal monthly installments and amortized so that the final payment is made no later than six (6) years after the date of assessment.

Class 7 (General Unsecured) consisted of "all allowed general unsecured claims that exceed $2500 and have not been reduced." Article II, Section G of the Plan provided for the rights of the General Unsecured Creditors. Under the Plan, the Debtor retained certain assets, including tax refunds and tax loss carry backs. The Plan also provided that certain of the Debtor's assets be liquidated for the benefit of class 1, 6, and 7 creditors, and that the Debtor would deposit all cash into an escrow account. Further, the Plan granted the Committee a security interest in all assets retained by the Debtor to secure payment of the class 7 claims and the Committee's attorney fees.

Generally, confirmation of a plan concludes the court's jurisdiction. However, if the Plan provides otherwise, the court may retain jurisdiction. In the present case, the Plan provided that the court would retain jurisdiction to compel the Debtor's compliance with the Plan and to enforce all rights and remedies arising from or related to a default under the terms of the Plan.[4]

The Plan was never completed. The Plan required that Reef issue promissory notes to the tax claimants upon the effective date of the Plan. The notes were to be paid in monthly installments. Reef never issued promissory notes on the effective date or any other date. Further, Reef never made any monthly payments to the IRS. After Reef failed to make any payments on taxes for quite a time, the State of Michigan brought a motion to convert. On July 25, 1988, the case was converted to Chapter 7. Marilyn Smith was appointed trustee.

## III. DISCUSSION

### A. EFFECT OF CONFIRMED PLAN

█ The Committee contends that the plan granted it a lien on all assets of the Debtor and that the confirmation order is *res judicata.* The Committee relies in part on *In re J.M. Fabrication, Inc.,* Case No. 80–04052 BE, slip op. (Bankr.E.D.Mich. September 10, 1984). That case had facts similar to the facts in this case. In *J.M. Fabrication,* the confirmed Chapter 11 plan provided that the creditors would be paid 40% of their allowed claims, 20% on confirmation and 20% payable at the rate of 1% per month. The creditor's committee was granted a security interest in all of the debtor's assets. In his first opinion, Judge Bernstein held that the rights of the IRS, which had received nothing under the plan, were superior to the unsecured creditors. *In re J.M. Fabrication, Inc.,* Case No. 80–04052 BE, slip op. (Bankr.E.D.Mich. April 28, 1984). At a subsequent hearing, Judge Bernstein reversed himself and held that because the IRS failed to take a timely appeal, the order of confirmation was final.

I can sympathize with Judge Bernstein's difficult decision, because the present case involves many of same issues. Neither

---

**3.** Section 507(a)(6) was renumbered in the 1984 Amendments as 507(a)(7).

**4.** The Plan allowed the court to retain jurisdiction for other purposes which are not important in this opinion.

Judge Bernstein nor I should have allowed the plans to be confirmed with the language providing the unsecured creditors a lien on all the debtor's assets. However, I do not believe Judge Bernstein had to reverse himself.

*J.M. Fabrication* relied on *Stoll v. Gottlieb*, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938). In that case a corporation filed for reorganization under § 77 B of the Bankruptcy Act of 1898 in the United States District Court for the Northern District of Illinois. Gottlieb was a creditor. The confirmed plan provided for the cancellation of a guaranty granted by Stoll to Gottlieb. Gottlieb did not appear at the confirmation hearing, but shortly thereafter he filed a petition in the district court to vacate or modify the order on the grounds that the district court lacked jurisdiction to cancel the guaranty. After a hearing, the petition was denied. Gottlieb then brought suit in the Municipal Court of Chicago against the guarantors. Stoll defended on the basis of *res judicata*. Gottlieb prevailed, but the Municipal Court was reversed by the Illinois Appellate Court. The appellate court was in turn reversed by the Supreme Court of Illinois. The United States Supreme Court reversed the Illinois Supreme Court. *Stoll v. Gottlieb* is relied upon by the Committee as being authority for the binding effect of an order confirming a plan. Some courts have so cited the case, but I do not agree. I believe *Stoll v. Gottlieb* is a leading case on the law that a court's decision can be binding even though it had no jurisdiction. The court clearly states at page 172, 59 S.Ct. at page 138, "[i]n this case the order upon the petition to vacate the confirmation settled the contest over jurisdiction." Id. at 172, 59 S.Ct. at 138. Thus, it was the decision on the post-confirmation petition to vacate or modify, *not* the order of confirmation, that formed the basis of the decision in *Stoll v. Gottlieb*.

This is not to say that an order confirming a plan cannot be final. For reasons set forth below I agree with most of the cases cited by the Committee. However, each case must be decided on its own facts. In many reorganization cases, interested parties will take no part in the confirmation proceedings because of the cost, the relatively small amount involved, or a misunderstanding of what is involved. The case at bar has been very difficult and complex. The negotiations on the plan commenced shortly after the petition was filed. Hearings on the disclosure statement commenced prior to May, 1984. On January 29, 1985, a first amended plan was filed. On February 15, 1985, the Second Amended Plan was filed. The Second Amended Plan was confirmed at a hearing on March 13, 1985, and the order was entered, April 25, 1985. The Plan was twenty (20) pages long with single spaced typing. The Plan and accompanying materials totalled over one hundred (100) pages.

Because of the heavy motion docket in Traverse City at the time, limited time was available for all hearings. When even a judge with many years service fails to catch the significance of the lien given to the unsecured creditors, it would be an injustice to require someone who is not an expert in bankruptcy to grasp the meaning of the provision for the lien. It is also unlikely that IRS would feel any need to object to the Plan because it was unclear whether the IRS was even a creditor at the time. Certainly the debtor did not consider IRS to be a creditor. The Plan itself indicated that tax refunds were an asset of the estate. On September 2, 1986, this proceeding was filed claiming refunds due. If the IRS was a tax creditor, it was entitled to a promissory note on the effective date of the Plan. It never received a note. If the IRS was a tax creditor, it was entitled to monthly payments; it never received a payment. The cases cited by the Committee have entirely different factual situations.

The Committee argues that conversion of the case to Chapter 7 did not destroy the rights previously granted under the Plan. The Committee cites, *In re Kaleidoscope of High Point, Inc.*, 56 B.R. 562 (Bankr.M.D. N.C.1986), and *Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.)*, 67 B.R. 899 (Bankr.E.D.Tenn.1986), in support of its position. In these two cases,

the debtors filed petitions under Chapter 11. Both debtors had plans confirmed, and subsequently, made payments under the plans. The cases were eventually converted to Chapter 7. In both cases, the parties attempted to "reel in" payments made during the Chapter 11 plan. Both courts held the plan was final and payments made under the plan could not be "reeled in." I agree with both decisions. Payments made during an ongoing Chapter 11 should not be "reeled in." As long as payments are made as required by the plan, and the plan remains in effect, a party can rely on the payments being final. However, once the plan is aborted, and a case is converted to Chapter 7, the parties must revert to Chapter 7 to distribute any remaining property of the estate.

■ The Committee also cites *Sanders v. GIAC Leasing Corp. (In re Sanders)*, 81 B.R. 496 (Bankr.W.D.Ark.1987), which held that where the confirmed plan grants the release of a guaranty, the enforcement of the guaranty is precluded by *res judicata*. The court so held, even though the plan was never consummated and the case had been converted to Chapter 7. I do not agree with the *Sanders* case. As previously stated, prior to conversion a confirmed plan is final and any challenge to the plan is precluded by *res judicata*. However, once a case is converted to Chapter 7, each case should be decided on its own facts.

In *Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir.1987), the plan released the guaranty of a former principal of a debtor corporation in consideration of her releasing $850,000 of a $1,000,000 insurance payment. There, the guarantor gave up a valuable right under the plan which would bring $850,000 into the plan. The court held that a bankruptcy court's confirmation order which released a third party guarantor, is to be given *res judicata* effect. I would agree with this decision.

In *In re Blanton Smith Corp.*, 81 B.R. 440 (M.D.Tenn.1987), the plan provided that the creditor would give up its priority position as an administrative claimant and agree to finance the debtor with no principal reduction. The creditor was granted a security interest in 75% of all preferences recovered by the trustee subordinated only to the trustee's cost of recovery. The plan was confirmed, but thereafter, the case was converted to Chapter 7. Prior to the conversion, the administrative claimants filed motions seeking an order directing the trustee to comply with the confirmed plan. The bankruptcy court held that the Chapter 7 trustee did not have to comply with the confirmed plan after the case was converted to Chapter 7. The district court reversed, holding that the order confirming the plan was *res judicata* such that even if based upon an error of law, the provision granting a security interest to the administrative claimants was not subject to reconsideration by the bankruptcy court. Unlike the present case, the class being protected by the lien in *Blanton* was already a preferred class and without its consent the debtor would have been required to pay off the class on the effective date of the plan. Thus, the administrative claimants in *Blanton* did not leapfrog over creditors with a higher priority, as the unsecured creditors attempted to do in the present case. Therefore, I agree with the district court in *Blanton*.

I would like to think that both Judge Bernstein and I read the provisions of the plans in our respective cases with the law in mind; however, it is more likely we never realized the significance of the lien provision. After all, in my thirty-four years on the bench, I have never encountered an instance where a creditors' committee and a debtor attempted to change the priorities set up by Congress by providing a lien on all assets to the unsecured creditors' committee. Congress gave tax claims priority over unsecured creditors. See 11 U.S.C. § 507(a). In the past, the Bankruptcy Code required debtors to pay off tax claimants in full on the effective date of the plan. This requirement precluded many debtors from reorganizing. Thus, Congress allowed for a delayed method of paying off tax priority claims to afford the debtors a better chance of reorganization. See 11 U.S.C. § 1129(a)(9)(C). Congress never intended that this grace period should be used by unsecured credi-

tors to gain priority over tax claims through the use of the adroitly concocted scheme of granting the unsecured creditors a lien on all assets, a lien which made no provision or allowance for the payment of the priority tax claims.

Section 1112 provides that a Chapter 11 case may be converted to Chapter 7. 11 U.S.C. § 1112. Many Bankruptcy Code sections and Bankruptcy Rules address the procedures to be followed after conversion.[5] Section 726(a) provides the distribution scheme to be followed when distributing assets in a Chapter 7 case. 11 U.S.C. § 726(a). Under section 726(a) a tax claimant has priority over a general unsecured claim. However, in the present case the Committee and the Debtor have tried to circumvent the priorities for distribution set out in 726(a) by granting the unsecured creditors a lien on all the Debtors assets.

▉ Even if the IRS is a creditor, which I question, it stands in the position of priority after the claims of administration and before unsecured claims. I conclude that the provision in the Plan must be read in conjunction with the provisions set forth in the Code and Rules pertaining to conversion cases. The unsecured creditors and the tax claimants were to be paid as the Plan provided. However, the Plan was never completed, and the case was converted to Chapter 7. Upon conversion, the assets should be distributed according to Chapter 7. Further, section 1123(b)(5) provides that "a plan may include any other appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(5). If the unsecured creditors' lien is allowed to prevail over the IRS, the Plan will be inconsistent with the Code. Thus to comply with the Bankruptcy Code,

---

5. Bankruptcy Code and Rules concerning the effects of conversion are as follows:

   a. The date of filing does not change. § 348.

   b. The order for relief is under Chapter 7. § 348.

   c. An interim trustee will be appointed. § 348 and § 701(a). (This has been done.)

   d. The debtor in possession shall turnover all assets, records etc. to the trustee after he qualifies. B.R. 1019(5). (I assume this has been done as the trustee has brought no action against the debtor in possession.)

   e. The debtor in possession shall file a final report and account within 30 days after the conversion indicating all unpaid claims arising between filing and conversion. R. 1019(6). (This case was converted on July 15, 1988. Although the 30 day period has expired, the debtor has not yet complied with this rule. The trustee should take any necessary action to enforce compliance.)

   f. Written notice will be given to all creditors created during the Chapter 11 proceedings. B.R. 1019(7). (This cannot be done until number 5 above has been complied with.)

   g. Notice of order for relief is given. § 348; § 342; B.R. 1019. (This has been done.)

   h. All claims actually filed in a superseded case are deemed filed in the Chapter 7 case. B.R. 1019(4).

   i. Conversion sets a new time period for filing claims not already actually filed. B.R. 3002; B.R. 1019(3).

   j. Conversion terminates the services of any trustee or examiner that is serving before conversion. § 348(e). (As far as I recall, there was no trustee or examiner prior to conversion.)

   k. Claims against the estate that arise after the order for relief but before conversion, except for administration expenses, shall be treated for all purposes as if the claim arose before the date of the filing of the petition. § 348(d).

   l. A discharge will be granted under Chapter 7. § 348. But, a corporation cannot be granted a discharge under Chapter 7. § 727(a)(1).

   m. The trustee shall timely perform all obligations of the debtor from and after conversion under any unexpired lease of nonresidential real property until lease is assumed or rejected. § 348; § 365(d)(3).

   n. Trustee has 60 days after conversion in which to assume or reject an executory contract or lease. § 348; § 365(d)(1).

   o. If the trustee does not assume or reject an unexpired lease on nonresidential real property within 60 day period, then the lease is deemed rejected and the trustee shall immediately surrender such nonresidential real estate to lessor. § 348(c); § 365(d)(4).

   p. If the debtor has income, the trustee will make and file a return of income for each taxable period during which the case was pending after conversion. § 348; § 728(b).

   q. Priority for distribution in Chapter 7 is set out in section 726(a):

    1st–all claims provided for in section 507(a);

    2nd–Timely filed claims under § 501(a) or (c);

    3rd–Tardily filed claims under § 501(a) other than one filed under § 726(a)(2)(C);

    4th–Fines, penalties, etc. § 726(a)(4);

    5th–Interest. § 726(a)(5);

    6th–To debtor. § 726(a)(6).

the unsecured creditors' lien must be read in a manner consistent with the Code, and therefore it must be read as subordinate to the priority tax claims.

## B. VIOLATION OF THE AUTOMATIC STAY

■ The Committee and the Debtor claim that the IRS violated the automatic stay when it set off the $96,051.57. Section 362(a)(7) provides:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 U.S.C. 78eee(a)(3)), operates as a stay, applicable to all entities, of—

\* \* \* \* \* \*

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor;

\* \* \* \* \* \*

Section 362(a)(7) applies only to debts that arose before the commencement of the case. The parties agree in their stipulated facts that the IRS was not a creditor on the date of the filing of the petition. Thus, I find no prepetition debt existed. Accordingly, I find the IRS had a right to set off its claim. In fact, the IRS had a legal obligation to set off the claim. See 26 U.S.C. § 6402(d).[6]

---

**6.** Section 6402(d) provides in pertinent part:
(d) Collection of debts owed to Federal agencies.—
(1) In general.—Upon receiving notice from any Federal agency that a named person owes a past-due legally enforceable debt (other than any OASDI overpayment and past due support subject to the provisions of subsection (c)) to such agency, the Secretary shall—
(A) reduce the amount of any overpayment payable to such person by the amount of such debt;
(B) pay the amount by which such overpayment is reduced under subparagraph (A) to such agency; and
(C) notify the person making such overpayment that such overpayment has been reduced by an amount necessary to satisfy such debt

**7.** Section 641 provides in pertinent part:

## C. EQUITABLE ASPECTS

■ This proceeding shocks one's sense of fairness and justice. The plaintiffs admit the IRS made an erroneous payment of $112,613.57. Obviously, the plaintiffs are not entitled to retain this windfall. In fact it is a crime to do so. See 18 U.S.C. § 641.[7] Yet, after the IRS set off the amount of the erroneous payment, plaintiffs brought this action to recover that same amount. The plaintiffs, who may have committed a technical conversion in cashing the refund check, are now suing to commit a second and intentional conversion.

The issues concerning whether the plaintiffs knowingly converted the erroneous payment, or whether they retained the payment knowing it was converted, are not for me to decide. However, it is difficult to believe that the plaintiffs were without knowledge of the erroneous nature of the payment. Furthermore, it seems impossible for the plaintiffs to deny their intent in bringing this action. During this proceeding it has become abundantly clear that the plaintiffs have no right to this money, but merely claim "finders keepers." Thus, assuming arguendo that the Plan is *res judicata* and Committee's lien prevails over the tax claims, equity requires the unsecured creditors' lien be subordinated to the priority tax claimants. See 11 U.S.C. §§ 105 and 510(c). Therefore, I find the IRS was entitled to retain the $96,051.98 set off from the tax refund due Reef.

---

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or
Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—
Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.
. . . .

## IV. COUNTERCLAIM

There are no proofs to indicate that plaintiffs are indebted to the IRS and no mention is made of such a claim in the brief. The court assumes that such a claim has been abandoned.

## V. CONCLUSION

Upon conversion of a case from Chapter 11 to Chapter 7, the debtor's assets should be distributed according to the distribution scheme set out in section 726(a). To do otherwise would be inconsistent with the Code and the intent of Congress. Therefore, the IRS is entitled to retain the $96,-051.59 set off against Reef's tax refund.

The Committee's argument that the set off violates the automatic stay fails because the debt arose postpetition. Section 362(a)(7) only applies to prepetition debts. As a result, the IRS did not violate the automatic stay.

Finally, assuming arguendo that the Committee's security interest prevails over the tax claims, the facts of this case are so unique, equity requires that the Committee's lien be subordinated to the priority tax claims. The plaintiffs admit the payment of $112,613.57 was a mistake. Essentially, the Committee is suing to commit conversion. I refuse to allow the Committee to use this court to obtain such an inequitable result. Thus, even if I had found the Plan to be *res judicata*, I still would have subordinated the Committee's lien to the priority tax claims under 11 U.S.C. §§ 105 and 510(c).

## ORDER

This matter having come before the Court for hearing on the parties' motion for summary judgment; and the Court having considered the stipulated facts, briefs and arguments of counsel; and the Court having made findings of fact and conclusions of law, as more specifically set forth in an Opinion dated this date and incorporated as part of this Order; and the Court being otherwise fully advised in the premises;

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. Plaintiffs' motion for summary judgment is denied.

2. Defendant's motion for summary judgment is granted.

3. Defendant's counterclaim is dismissed with prejudice.

4. No costs are allowed except as to any costs that may be assessed, after an appropriate hearing upon a motion for sanctions under the Bankruptcy Rule 9011(a).